Will the clerk please call the next case? 525-0047-WC, Jacqueline Sumner, Appalee v. Angie Zinzolita v. the Illinois Workers' Compensation Commission, et al., Places Smart, Knott's Logistics, Appellant v. Natalie Christian. Okay. Counsel, you may proceed. Thank you. Good afternoon, Your Honors. Natalie Christian for the Appellant, Places Smart, Knott's Logistics. May it please the Court. We're here today on a straightforward causation dispute. Appellant is asking the Court to affirm the decision of the Commission, which found that Ms. Sumner's cervical spine condition was not causally related to her August 27, 2020 work accident. The Court's not being asked to reweigh the evidence. We are here to determine whether the Commission's was against the manifesto of the evidence or whether the opposite conclusion was apparent. And here, Appellant does not believe that that's the case. The problem for Ms. Sumner was a lack of medical documentation supporting a cervical spine injury. Brief timeline of how we got here, the accident itself. Ms. Sumner had an accident on August 27, 2020, not disputed, and she sought immediate treatment. When she went for that treatment, she reported right shoulder symptoms only. The exam findings were to the right shoulder only, no additional symptoms or exam findings to the neck or the cervical spine. She continued with treatment with Dr. Neighbors multiple occasions after that, again reporting right shoulder symptoms, right shoulder findings on exam, nothing about the cervical spine, no exam findings for the cervical spine. About a month later when she saw Dr. Neighbors, she also, and quote, told him that she was feeling much better. During that time, after that time, she didn't seek any additional treatment. She moved on and worked for a couple of different employers, and nine months had passed. And then she saw Dr. Lee for the first time in May of 21, wherein this was the first time she reported any cervical spine symptomology. To fill in the gap, that nine-month gap, Ms. Sumner relies on Dr. Lee who gave an opinion that her cervical spine condition was related to the accident and that it went overlooked because the shoulder and the neck are closely related. However, in his own testimony, he conceded that a cervical spine condition would have presented within six weeks of the accident, and also that there was nothing in the medical record supporting any type of cervical spine symptomology or exam findings. Ms. Sumner also has asserted that she was prejudiced by not receiving physical therapy treatment, which is inaccurate. Physical evidence at trial in the form of emails, as well as testimony from the employer supporting that we had approved physical therapy, which was prescribed for the right shoulder only, and that she did not seek that treatment. The commission found the appellant section 12 expert, Dr. Chabot, more credible than Dr. Lee, Ms. Sumner's treating physician. Dr. Chabot also opined that petitioner's cervical spine condition was unrelated to the work accident, and it would have presented within six weeks of the accident. Additionally, that there was nothing in the medical record supporting a cervical spine symptomology or exam findings. The court has regularly deferred to the trier of fact to assess the credibility of the witnesses, and the commission found Dr. Chabot and Ms. Tanner, who testified on behalf of the respondent, credible. Ms. Sumner relies in her brief on multiple well-established cases to support her position that she didn't have a cervical spine condition prior to the accident, and she had one after the accident. Thus, it's causally related. However, when we look at these cases individually, the fact patterns of those cases are not analogous to our case at hand. They all have a very similar fact pattern in which there is an accident, there is immediate symptomology, contemporaneous and continuous medical documentation of that injury and symptomology, and no gaps in treatment. Ms. Sumner additionally accuses appellant of ignoring the holdings in these cases, which is simply a red herring. We have never once identified that we dispute the holdings in these cases, nor have issue with the holdings in these cases. We are simply identifying what the commission also saw, that the fact patterns of them are not analogous to the case we are discussing here today. The commission's decision was supported by the record, does not go against the manifest weight of the evidence, and we respectfully request the court affirm the decision of the commission. Any questions from the court? Counsel, was there documentation of the approval of PT that occurred? I mean, the way I recollect the record, there was a recommendation, I think, by her treater, and I want to say within a month of the work accident, and the doctor's notes say PT was not approved. Yes, we did receive the physical therapy, and counsel had asked, I believe the evidence that was provided at trial was evidence of email correspondence between counsel and I regarding the physical therapy. She had inquired to me as to whether or not the PT was approved. I responded to her that it was. Was that about the same time as, it was Dr. Neighbors who was the initial treater? Yes. About the same time as his note that PT was not approved? Yes, it was. Thank you, counsel. Sure. Additional questions? No? You'll have time in reply. Thank you. Okay. Counsel, you may respond. Thank you, your honors. May it please the court, counsel. My name is Angie Zenzaletta, and I represent Jacqueline Sumner in this case. We are asking today that the court affirm the circuit court's decision overturning the commission's decision and adopting the dissent's opinion. In this case, you will see that the commission applied the wrong standard in determining whether or not Ms. Sumner's cervical condition was caused by her workplace injury. The holdings in the cases that we cited to, International Harvester and the long line of cases thereafter, do not require immediacy for reporting of symptomology. In our briefing, we did an extensive distinguishing between the cases, and I noticed, for example, your honors, with the TSCA case, respondent in this case heavily relies upon the immediacy in these cases, how folks had the symptomology, and they reported it immediately. However, in the TSCA case, we have, that's a herniated case, a herniated disc case, and in that case, the petitioner reported pain in their shoulder and down their arm. In this case here, Ms. Sumner reports to the local urgent care and says, hey, I've got this marked up shoulder, it hurts, I fell, it's wounded, and I've got pain in my shoulder and into my traps. Dr. Lee testifies, yeah, we oftentimes see that type of symptomology overlaps. It's the connected area. So from day one, Ms. Sumner was complaining of that type of symptomology. That's what she's complaining of. So the TSCA case and those support our position that there was no, absolutely no break in the causal chain here, none. What we have is a lady who had suffered a sudden traumatic event. Prior to that, we have no evidence that she was ever treated for any kind of back injury, none whatsoever. She has this event, tears the shirt, bleeding, gets treated at the urgent care that day. Now she's hurt. We have an MRI done. Even the defense medical exam expert says, hey, it does show these objective findings. I don't disagree with you on that. And we have prescriptive treatment. She testified that since she's had the incident, she's suffered with back pain since she's had the incident. We have no superseding event, no intervening event, nothing. We have a lady who here is the epitome of the holding an international harvester. This is the causal chain event. So just clarify for me, you said that there were objective medical findings that suggested her cervical spine injury was present after the accident and that even though she may not have specifically complained of back or neck injury, it was because the shoulder injury is in such a same locale as those other injuries that she was focused only on the shoulder. That's correct, your honor. So the MRI she had of her neck subsequent to the injury does show objective findings from C3, C4, C4, C5, and C5, C6. Dr. Chabot in his testimony and mentioned in our brief did admit to me and agreed with me on cross-examination that those are clear objective findings that he is reading on the MRI. He doesn't doubt that at all. Now, whether that he believes that is the need for surgery is a different story, but he says those findings, they are there on the MRI. When she was first treated with Dr. Neighbors, he is the local Clinton County rural care provider that's actually connected through HSHS. He was focused on that shoulder that had the abrasions on it in the arm area. And that's when he recommended, hey, you need to go get PT and I'm not seeing you until you get PT. And then that's when we had the medical office hoopla where we were not getting approval for the PT. And regardless of whether defense council testifies that they were giving approval, the folks that matter the most, the medical provider is stating in their records, we're not getting approval. And we're not seeing this lady until we get approval for this. So it leaves my client in a situation where she can't do anything. She's like a lame duck sitting there. And it wasn't until she saw the orthopedic specialist outside her PCP that she was able to get that more concentrated treatment to figure out what's going on and do a proper full examination. And when she got that treatment and MRI, well, here we go with those objective findings all throughout the cervical. Does that answer your question, your honor? Yes, it does. Thank you. Thank you. In all your honor, based on the causation of events here and the respondent's inability to break the causal chain of connection here, the court, the circuit court did exactly what we'd expect the circuit court to do in this situation. They said, hold up, we've got case law here and the case law says this is what we should apply. We have a healthy worker, event happens, worker now has this injury and ongoing symptomology. It's a very simple analysis. That's what International Harvester stands for, Tesco stands for, Lassley stands for. They don't stand for the proposition that my client needs to immediately walk into her PCP's office and say, hey, doc, in that note, I want you to tell them I'm having the cervical soreness here at C3C4. Please notify that. No, that's not what they do. She walks into her PCP office and she falls down and she's got the banged up shoulder and says, hey, my shoulder hurts, my trap hurts, this whole area is really hurting. And he says, okay, follows through with her and says, all right, I know you're still hurting, but you need to get the PT done. And then that's when the treatment stops until she can get in with Dr. Lee. And then that's when her treatment begins again until we have the surgical recommendation. Refresh my memory, how long of time was there between when the PCP doctor said go get physical therapy and then come back and see me and the time she actually got physical therapy? My recollection is, your honor, is I want to say it was shortly after she saw Dr. Lee. But I don't believe, offhand, I can't tell you, but I believe it was shortly after Dr. Lee 10 months later is when she was able to get that PT done. Okay, but if I remember just a moment ago, counsel, the appellant suggested that she had notified you that they were approving that. Is that your recollection as well? Correct. So that was the big issue we had in this case. An email to me saying something's approved in our world, in the real world, doesn't mean much unless the medical provider has that system. And that's what this issue is, is this lady was really caught in the system between workers comp not approving it the way they should and nobody wanting to treat a workplace injury with workers comp not approving it. So even though I got an email that says one line, we have approved it, all of the medical providers are telling me, as noted in Dr. Naber's note, they're not giving us approval. So we can't move forward until we have that approval. And was there any kind of follow-up with appellant's attorneys about needing to approve it the proper way as opposed to through an email to you? I did have several emails back and forth. By the time that Ms. Sumner went back to Clinton County, Dr. Naber's had retired. So then she went to see Dr. Lee and switched her treatment over there after Dr. Naber's retired. So from the time that appellant's attorneys notified you guys that they were approving it, are you suggesting that those follow-up emails and requests for proper authorization took 10 months to get it done? No, I would tell you, Your Honor, that the approval for the PT, the time when she finally could get her PT in, is because Dr. Lee referred her, I believe, to the PT. So it was through a different system. So then what you're saying is that the proper approval through the medical providers was never done? Correct, that's exactly right. Until that other doctor got involved. Correct, until Dr. Lee took over treatment. Yes, sir. Thank you for clarifying that. Yes, no, thank you. And so in all, Your Honor, I believe the long case's holdings in this case, and what the circuit court did, they applied the correct legal analysis here. They did not reweigh the evidence. They looked at the evidence. They did not cherry pick any evidence, and they did not ignore medical testimony. I, again, believe that, unfortunately, as much as the appellant would prefer that the cases required immediacy reporting of symptomology, that those cases do not. And in fact, the causal chain of connection that we have here was never broken. And I believe the circuit court's decision should be affirmed. Any questions? The arbitrator found that Joyce Tanner from the employer had approved that PT. Thank you, counsel. Yes, Your Honor. The arbitrator did say that, but as I, Your Honor, astutely pointed out, the folks that it really matters who get that approval were all noting that they did not have the approval. And, you know, I know that you're relying on Dr. Lee, but I think it was Dr. Lee who admitted that ordinarily cervical symptoms are going to show up quickly. Sure. And I agree with that. And I think that's what Dr. Lee is saying, is that your body, that neck area, it's all very much connected. So when you're sore in that trap neck shoulder area, and I fall and I have a cut on my arm as a normal person, a lay person, I'm going to assume, ah, I must have messed up my shoulder. That's what I'm going to assume. I'm not going to assume that my neck will distribute into my trap and have the ridiculous symptomology that we all know of. What's the trap? Trapezius. What is it? Trapezius, yes, the trap. That would be nicer to say. Sorry, Trapezius. No offense, we don't speak in acronyms. And you may do that at a commission hearing or an arbitration hearing, but a little more formality. We're not acronym speakers. So hit on that one. Well, everybody's been talking about it, but I mean, you know, it's physical therapy. Yes, it's living in both worlds sometimes. Yes, Your Honor. Okay. Yeah. Any other questions from the court? Thank you, Counsel. Thank you, Counsel. Counsel, you may reply. Thank you, Your Honors. A couple of things that I'd like to note. There was some discussion about the physical therapy authorization. In fact, we did offer email evidence as well as the testimony of Ms. Tanner. I'd like to highlight the fact that Counsel has identified that they made multiple attempts after the fact to get authorization through appropriate channels. However, they've provided no evidence to substantiate those efforts were made. You know, typically in our work comp system, physical therapy is coordinated either directly with the provider or through a vendor. In this situation, we would have been happy to do either had we received further follow-up. The physical therapy that was obtained by Dr. and prescribed by Dr. Lee was separate and and not actually addressed until 10 months later. Let me ask just a follow-up on that question. So after you authorized it, that first go around, when did you become aware that the medical providers were needing something additional? Your Honor, after we received that email correspondence, the case became very dormant. It was very inactive for the entire nine months that Ms. Sumner did not seek treatment after she was prescribed that physical therapy and had told him in her September 2020 visit that she was feeling much better. We didn't get any medical documentation until May of 2021, and that is when this entire situation with the disputed physical therapy, disputed cervical spine condition began. So in other words, what you're telling us and what was in evidence with the arbitrator and the commission was that you never were requested to do anything further after you notified them that you had approved it? That's correct. Okay. Counsel also highlighted one of the cases that they cited called Tesca on the record, identifying that the, as well as International Harvester, identifying that immediate symptomology is not required. We don't dispute that. What we're simply identifying is that in many, in all of the cases that she cited, there was a very short timeline of seeking treatment, identifying symptoms, having physical objective findings on exam, and then prescribed in treatment that was obtained. Counsel referenced that there is a close connection between the shoulder, the neck, and the trapezius. This obviously sounds accurate given the physical correlation of those body parts. However, the medical record does not contain the word, if you do a word search, neck or cervical spine in any of the treatment records by Dr. Neighbors or the immediate care from the initial visit until she's seen by Dr. Lee. That's the first time we see those words. There's not even- And that was May 20, 2021. That's correct. There are no symptoms either of ridiculous symptoms, nothing saying that the pain in her shoulder is going down the arm or up into the neck. It's simply focused on the right shoulder only. If the original treating physician indicated that after the initial visit, yes, you've injured your shoulder, go get physical therapy before I do anything further with this, is that accurate? I'm not aware of the doctor ever stating that they won't see her again until physical therapy is approved. My recollection is that they had recommended it. They did identify that they believed there to be an issue with scheduling, but that the issue with Dr. Neighbors was that he had retired. I guess my point is there would have been no further examination, no more discussion about the extent of the injuries from this accident until the next doctor visit, which was 10 months after that. I suppose that's accurate. So in the line of how quickly things were reported, it wasn't as though she were treating for a shoulder injury for nine months with doctors or physical therapists or whatnot, and then after 10 months started to complain about the neck injury? That's correct, Your Honor. She had stopped treatment altogether, went nine months without seeking any care or reporting any conditions, and then sought treatment nine months later. Okay. And I guess the, I may be parsing words here, but when you say she stopped treatment after her initial visit, from what I'm gathering, she never started treatment. She was examined, given a line of treatment, a course of treatment, which would have consisted of physical therapy and never got it, regardless of the reasoning, never got physical therapy. So she didn't really stop treatment for nine months. She never started treatment after the initial visit, and that's not, and her testimony is that she was, I guess, in somewhat of discomfort pain throughout that period of time, which led her to the second visit 10 months later. Yes. Okay. Yes. Your time has expired, but if you'd like to do a summary, conclude. Mr. Eldridge, can I ask one more question? Well, I, yes. Thank you. Last question. Your recollection of the record, this particular claimant had no prior neck or back injuries. Is that correct? Prior to that, no record of that? There was no record of that to our knowledge. Okay. Thank you. Any further questions, John? No, thank you. Okay. Okay. Would you like to summarize, please? Yes. Just briefly, Your Honor. Thank you. The decision of the Commission, you know, accurately considered all of the evidence. They provided a credibility assessment of the witnesses and the evidence submitted at trial, and I don't, repellent does not believe that there is a clearly apparent alternate conclusion, and we request this Court affirm the Commission's decision. Very good. No further questions. Again, thank you, counsel, both for your arguments in this matter this afternoon, and will be taken under advisement. A written disposition shall issue.